## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 16-40479-CJP |
| TAMMY J. BAILEY, | ) | |
| Debtor | ) | |
| | ) | |
| | ) | |
| WILLIAM K. HARRINGTON, UNITED | ) | |
| STATES TRUSTEE, | ) | |
| Plaintiff | ) | Adv. Pro. No. 19-04006-CJP |
| v. | ) | |
| | ) | |
| TAMMY J. BAILEY, | ) | |
| Defendant | ) | |
| | ) | |

### MEMORANDUM OF DECISION

The United States Trustee ("UST") filed a motion (Dkt. No. 110) (the "Motion") seeking to dismiss the Chapter 7 case of the debtor, Tammy J. Bailey (the "Debtor"), for abuse under 11 U.S.C. § 707(b)(3)[1] to which the Debtor objected (Dkt. No. 113) (the "Response"). The Motion had been consolidated for trial with the UST's two-count complaint brought under § 727(a)(4) and (a)(5) (the "Discharge Objections"). Pursuant to the Discharge Objections, the UST alternatively seeks to deny the Debtor's discharge if the case is not dismissed.

The following decision constitutes my findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052. In reaching my determination, I have considered (i) the demeanor and credibility of the Debtor, the only witness who testified at the trial held in this matter, (ii) the exhibits that were admitted into evidence, (iii) facts that have been admitted in the answer, the response to the Motion, and the joint pretrial memorandum, (iv) the record in the

---

[1] Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code").

Debtor's case, and (v) the oral arguments of counsel.  I have also taken judicial notice of the

dockets in this case and in the related bankruptcy case of the Debtor's spouse.

## I.   **JURISDICTION**

This Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 157(a) and 1334

and Rule 201 of the Local Rules of the United States District Court for the District of

Massachusetts.  The matters are core proceedings within the meaning of 28 U.S.C. §

157(b)(2)(A) and (J). Both parties acknowledged that I have authority to enter a final order with

respect to the Motion and a final judgment regarding the consolidated Discharge Objections

asserted in the adversary proceeding.

## II.   **FINDINGS OF FACT**[2]

### A.  **Background**

The Debtor filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code

on March 23, 2016 (the "Petition Date").  On April 22, 2016, the Debtor filed her Statement of

Financial Affairs ("SOFA") and schedules, signing accompanying declarations under penalties

of perjury that the schedules and SOFA were true and correct to the best of her knowledge and

belief.  Schedules I and J reflected a combined monthly income of $7,109.61 for the Debtor and

her non-filing spouse, and monthly household expenses of $6,410.25, leaving a monthly net

income of $699.36.

The Debtor also filed a Chapter 13 Plan (the "Plan") concurrently with her schedules.

Under the Plan, the Debtor proposed payments to the Chapter 13 Trustee (the "Trustee") in the

amount of $700 per month for a period of 60 months.  The Debtor's "Chapter 13 Statement of

[Her] Current Monthly Income and Calculation of Commitment Period" (Official Form 122C-1),

---

[2] Additional findings of fact are made in other sections of this decision. To the extent any item in this
Memorandum of Decision ("Decision") is labeled as a finding of fact, but is actually a conclusion of law
(or the opposite), it is adopted as such.

showed that the Debtor was a below median debtor for a household of five in Massachusetts and

had an applicable plan commitment period of three years.  The Debtor voluntarily proposed a 60

month plan payment term in order to "cure home mortgage arrears."  Plan § 1.  Through her

Plan, the Debtor proposed to cure prepetition arrears of $35,230 and maintain payments with

respect to the claim of U.S. Bank Trust, N.A., as Trustee for LSF8 Master Participation Trust

(the "Bank"), secured by the Debtor's residence. The Plan included an estimated zero percent

(0%) dividend to unsecured creditors with claims totaling $189,872.34, of which $173,472.42

were nondischargeable student loan claims and $16,399.92 were nonpriority general unsecured

claims.

On May 27, 2016, the Bank objected to confirmation of the Plan pursuant to § 1325,

asserting the Debtor failed to cure the total amount of its prepetition arrears of $43,443.78, which

would be reflected in a "soon to be filed Proof of Claim."[3]  The Debtor responded to the Bank's

objection and, after a hearing on October 4, 2016,[4] I sustained the confirmation objection and

ordered the Debtor to file an amended plan.

On October 20, 2016, the Debtor filed an amended Chapter 13 plan (the "Amended

Plan"), which provided for increased monthly payments in the amount of $925 for 60 months in

order to address the Bank's prepetition arrears totaling $46,370.30, as reflected in the proof of

claim filed by the Bank.  Pursuant to the Amended Plan, the estimated dividend to unsecured

creditors remained at zero percent (0%) on increased total claims of $193,525.17, of which

$177,125.25 were nondischargeable student loan claims and $16,399.92 were nonpriority general

unsecured claims.  The Debtor also filed an amended Schedule J on October 20, 2016 ("First

---

[3]  The Bank subsequently filed Proof of Claim No. 10, which included prepetition arrears in the amount of
$46,370.30.

[4]  Pursuant to the certificate of conference regarding its confirmation objection, the Bank reported that the
Debtor had been approved for a trial loan modification and the hearing was scheduled after expiration of
the trial loan modification period.

Amended Schedule J"), noting that "Schedule J, [wa]s no longer a true and accurate representation of Debtor's income, expenses and disposable income" and reflecting reduced expenses and increased net monthly household income of $924.36.

I entered an order confirming the Amended Plan on February 8, 2017.  On May 8, 2017, the Bank filed a motion for relief from stay, alleging that the Debtor was in arrears for thirteen (13) postpetition payments from April, 2016 to April, 2017, totaling $21,575.49 (the "Stay Relief Motion").  The record does not include any bank statements or other evidence showing the Debtor's actual expenses at the time she filed her First Amended Schedule J and Amended Plan or for the period following confirmation of the Amended Plan through filing of the Stay Relief Motion.

The Debtor and the Bank entered into an agreement to resolve the arrearages asserted in the Stay Relief Motion (the "Stipulation"), stipulating that a lump sum payment of $17,000 made by the Debtor on June 27, 2017, would be applied to outstanding postpetition payments. The parties further agreed that the Debtor would cure the remaining postpetition arrears through additional monthly payments of $1,966.73.

The Trustee objected to approval of the Stipulation because "the Debtor . . . failed to identify the source of the $17,000.00 lump sum payment made to the mortgagee or how [the Debtor] will be able to maintain a cure amount of $1,900.00 per month in addition to her regular mortgage payment of $1,645.73."  Obj. 1, Dkt. No. 61.  The Debtor filed a response stating "the $17,000 lump sum payment was funded from the non-filing spouse's pension account."  Resp. 1, Dkt. No. 62.  At the hearing on approval of the Stipulation, Debtor's counsel represented that the $17,000 payment came from a withdrawal from the non-filing spouse's retirement account and that a second withdrawal from the retirement account would be taken in order to make the additional cure payments due through November, 2017, the Trustee withdrew her objection, and

I approved the Stipulation.  At the trial on the Motion and Discharge Objections, the Debtor

testified she did not remember where she thought she would get the funds to make the $3,612

payments for the months of August, 2017 through November, 2017, representing the regular

monthly payment amount and the monthly cure payment amount due pursuant to the Stipulation.

The Debtor acknowledged that her Schedules I and J on file at the time did not reflect she had

sufficient funds to pay and testified that she may have borrowed from a family member to help

her and that "if we took from other places to make it happen then we took from other places to

make it happen."

On October 2, 2017, the Bank filed a certificate of non-compliance asserting that the

Debtor had failed to comply with the terms of the Stipulation and seeking entry of an order

granting the Stay Relief Motion. The Debtor did not file an objection to the certificate, and the

Court granted the Bank relief from stay on October 26, 2017.

On March 20, 2018, the Trustee moved to dismiss the Debtor's case, because the Debtor

was in arrears according to the terms of the Plan in the amount of $3,761, or 4 monthly

payments, and because the Debtor failed to produce a copy of her 2016 federal tax return.  The

Debtor filed a limited response to the Trustee's dismissal motion, stating that she intended to

convert her case, but that "[i]n the event the Debtor is unable to convert or her intent changes the

Debtor request[ed] that the matter be set for hearing."  Ltd. Resp. ¶ 2.

On April 6, 2018, the Debtor voluntarily converted her case to one under Chapter 7.  Also

on April 6, 2018, the Debtor moved to further amend her Schedules I and J.  The Debtor's post-

conversion amended Schedules I and J ("Post-Conversion Schedules") were amended more than

seventeen months after the Debtor's last amendment and reflected combined monthly income of

the Debtor and her non-filing spouse of $9,195.83 and monthly household expenses of

$9,195.83, leaving a monthly net income of negative $.37.[5]  Pursuant the Final Report and

Account, the Trustee distributed payments totaling $15,664 under the confirmed Amended Plan

prior to conversion.

On December 21, 2017, the Debtor's spouse, Todd Bailey, filed a separate Chapter 13

case (Bankr. Case No. 17-42263), which remains pending. In his case, Mr. Bailey filed initial

Schedules I and J on December 21, 2017 and several supplemental Schedules I and J. The

Debtor's Post-Conversion Schedules were consistent with her spouse's supplemental Schedules I

and J on file at the time of the Debtor's conversion.[6]

### 1. The Debtor's Income and Expenses

With respect to alleged missing disclosures on Schedule I, the Debtor testified that, after

the Petition Date, she had earned small amounts of other income from "hobbies" such as the sale

of skin products that she did not include on her supplemental schedules.  The Debtor's 2017

jointly filed federal tax return (Ex. 35) showed an $84 profit from operation of a business and

miscellaneous total income of $1,742.10 as reflected on Form 1099-MISC income (Ex. 36) and

Schedule C of the 2017 federal return.  The Debtor also testified that she received certain

payments towards heating expenses from her father-in-law prepetition, but neither her original

nor her Post-Conversion Schedule I reflected any such contributions.   She testified at trial that

the prepetition payments were inconsistent and she did not think of them as "income,"

---

[5] Although characterizing all of her amended Schedules I and J as "supplemental" schedules in motions to amend those schedules, the Debtor checked in the "amended" box in the caption of the amended schedules that they were "amended filing[s]" instead of "supplement[s] showing post-petition chapter 13 expenses as of" a specific date. If the Debtor had intended any of her subsequent amendments to her schedules to be a supplemental postpetition updates of income or expenses, she never checked that box on her schedules and no evidence was provided as of what date the Debtor contemplated the changed information, but given the timing of the filings and the necessity for the Debtor to demonstrate her Amended Plan was feasible and that, subsequently, the Debtor's disposable income would not sustain any plan, the Court infers that updated information was intended as of the date of the date of the amendments.

[6] Mr. Bailey's schedules reflected a combined monthly income of $9,195.49 and expenses of $8,003.83, which resulted in monthly net income of $1,191.66 in his case.

comporting  with her deposition testimony.  Additionally, the Debtor had included a "Pension

RA" deduction on her original Schedule I as of the Petition Date, but the deduction was not

reflected on her Post-Conversion Schedule I, even though the Debtor testified it was a mandatory

deduction she was still taking.

The Debtor's Post-Conversion Schedule J included increased expenses for, among other

things, (i) food and housekeeping supplies ($1,550, increased from $803), (ii) electricity, heat,

natural gas ($500, increased from $450), (iii) telephone, cell phone internet, satellite and cable

services ($530, increased from $425), (iv) transportation ($570, increased from $450), (v)

medical and dental expenses ($402, increased from $50), (vi) entertainment, clubs, recreation,

newspapers, magazines and books ($103, increased from $65), (vii) incidentals ($75, increased

from $25), (viii) "other" specified child-related expenses ($675 allocated for "Children in and

out of school" increased from $41.67 for "children activities") and (ix) $500 for a first-time

cigarette/tobacco expense.

The Debtor offered limited testimony regarding the increases in the expenses, addressing

only the food and housekeeping supplies and child-related expense line item increases and the

inclusion of the cigarette/tobacco expense.  The food and housekeeping supplies expense

increased, even though the Debtor testified there were fewer family members living at home at

the time the Post-Conversion Schedule J was filed.  The household size never changed on any of

the Debtor's amended schedules.

The parties entered into evidence bank statements for most of the months between

September, 2017, and April, 2019 (Exs. 7 – 33).  The bank statements through April, 2018, when

the Debtor filed her Post-Conversion Schedules, and in subsequent months show that the

spending habits of the Debtor and her family included discretionary spending that was

inconsistent with the First Amended Schedule J filed in October of 2016 and with the Debtor's

payment obligations under the Stipulation and Amended Plan, but no contemporaneous bank statements were provided.  Prior to conversion, the Debtor failed to make mortgage payments as required by the Stipulation, which resulted in stay relief being granted, and failed to make at least four plan payments.

The Debtor testified that the estimates included in her schedules were derived from her review of her family's "bills" during these periods and reflected anticipated "belt-tightening." The Debtor also testified forthrightly that she was "going to do whatever [she] had to do not to lose [her] home."  She could not explain how she intended to get the additional funds required to pay the cure payments required by the Stipulation.  She testified that she believed that "less was best" when she was estimating expenses during the Chapter 13 case to show that she and her husband "could afford the mortgage."  When asked about the differences in her earlier estimates of expenses and the expenses reflected in Post-Conversion Schedule J, she stated that she "filled out [the forms] the way [she] thought she needed to" to show she could afford her mortgage. The UST did not introduce into evidence any bank statements or other financial records that were contemporaneous with the dates of the Debtor's pre-conversion financial disclosures or impeach the Debtor regarding her estimates of expenses by confronting her with evidence of actual expenses incurred at that time the Debtor made her estimates in her pre-conversion schedules.

### 2.  Tax Returns and Refunds

There is no evidence in the record showing that the Debtor provided the Trustee with copies of her 2016 or 2017 tax returns during the pendency of her Chapter 13 case, although the Debtor testified that she provided her tax returns to her counsel.  One of the bases asserted by Trustee in support of her motion seeking for dismissal of the Debtor's Chapter 13 case was that the Debtor had failed to provide a copy of the 2016 return.  The Debtor never addressed the

substantive allegations supporting dismissal, instead converting her case to Chapter 7.
Additionally, it appears that the Debtor did not make the Trustee aware that she had received
income tax refunds during her Chapter 13 case, but did provide information regarding a
prepetition refund received by the Debtor and her husband.

At the § 341 meeting of creditors held in this case, the Debtor disclosed that, prior to
filing her petition, she had received a tax refund for 2015 in the amount of $11,000.  She testified
that, at the time she received her 2015 refund, she did not plan to file bankruptcy and only
learned days before the Petition Date that her house was scheduled for foreclosure, stating that
she was unaware that her husband had not been paying the mortgage.  The Debtor testified that a
substantial portion of the refund was spent paying tuition ($5,000), credit card bills ($900 –
$1000), auto insurance ($1,500), and clothing in an unstated amount.  At the time of the filing,
the Debtor scheduled $250 in cash and deposits.  Neither party introduced bank records from that
period that may have accounted more precisely for the balance of the tax refund spent in the
month before the bankruptcy filing.  The record does reflect that the Debtor paid $1,430 plus
expenses to her counsel (Dkt. Nos. 8 and 20).

The Debtor did not disclose the 2015 prepetition tax refund as "other income" in 2016 in
response to Question 5 in her Statement of Financial Affairs, but did disclose the full amount of
her 2015 gross income in response to Question 4 in her Statement of Financial Affairs.  The
Debtor also disclosed a taxable state income tax refund received as "other income" in response to
Question 5.  In estimating her monthly income on Schedule I in her original schedules, the
Debtor included "other income" of $800 on account of "1/12 anticipated tax refund" on line 8(h).
The Debtor testified that she and her husband usually received a large tax refund, which suggests
they over-withheld taxes from their gross income, resulting in substantial refunds.  The estimate

of a tax refund of $9,600 ($800 x 12) in Schedule I was not materially less than the actual

$10,495 federal income tax refund[7] and $646 state income tax refund for that year.

The Debtor did not amend Schedule I until her conversion on April 6, 2018, at which

time she reduced the estimated over-withholding to $400 each month, amounting to $4,800 for

the year.  The Debtor filed the Post-Conversion Schedule I approximately two months after the

Debtor received federal tax refund for 2017 of $16,450.  When asked about estimates of future

tax returns, the Debtor was unclear, but referenced that she anticipated lower refund amounts

because she believed that the education expenses for her children will be reduced, presumably

resulting in lower deductions or tax credits.

## III.   DISCUSSION

### A.  Motion to Dismiss for Abuse under § 707(b)(3)

In the Motion, the UST asserts that the totality of the circumstances in this case supports

a determination "that the Debtor is not entitled to a [C]hapter 7 discharge because the Debtor

cannot demonstrate that her 'relationship with [her] creditors has been marked by essentially

honorable and undeceptive dealings.'"  Mot. ¶ 23 (quoting *First USA v. Lamanna (In re

Lamanna)*, 153 F.3d 1, 4 (1st Cir. 1998)).  The UST maintains the Debtor's financial

circumstances demonstrate abuse stating "the Debtor has, at best, filed inaccurate schedules and

failed to make forthright disclosures [and a]t worst, through the filing of multiple sworn

schedules containing multiple[] versions of her finances, the Debtor demonstrates a lack of

honesty."  *Id*. at ¶ 22.

In response, the Debtor asserts that she has "acted in good faith throughout the course of

her case," even though "like many debtors coming into bankruptcy [she] lacked financial literacy

---

[7] The Debtor's 2016 federal tax return (Ex. 37) shows that the Debtor would have been entitled to receive
a $10,495 federal income tax refund.

and book[keep]ing skills." Resp. ¶ 22. The Debtor "admits to having financial hardships in her life" and "has not been able to manage her money properly resulting in bad budgeting, home mortgage arrears and other financial challenges . . . [but] has worked hard to better budget, live within her means and keep her home." *Id.* at ¶ 28. The Debtor also argues that, if the Court dismisses the case because of the filing of supplemental Schedules J, "many cases would be dismissed, as debtors regularly have to re-budget during a lengthy chapter 13 plan [because i]ncome and expenses change over time [as f]ood cost[s] rise, medical expenses rise, and income changes[,] which require amended budgeting [to be filed] with the Court." *Id.* at ¶ 25. Counsel to the Debtor argues that each Schedule J constituted a reasonable "budget" of the Debtor's anticipated expenses, but that the Debtor failed in her effort to reduce expenses.[8]

Section 707(b)(1) provides that a court "may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts . . . if it finds that the granting of relief would be an abuse of the provisions of this chapter." 11 U.S.C. § 707(b)(1).[9] Where no

---

[8] The Court notes that both Schedules I and J require good faith "estimates," not "budgets," but that those could be the same in some circumstances. "However imperfect, because Schedules I and J to Official Form 6 are the closest things we have to a 'budget' in Chapter 13 cases, realism in listing income and expenditures in Schedules I and J remains fundamental to a successful Chapter 13 plan. . . ." Keith M. Lundin, *Lundin On Chapter 13*, § 36.16, at ¶ 16, LundinOnChapter13.com (last visited on April 29, 2021).

[9] Although not raised by either party, a threshold issue is whether § 707(b) applies only to cases that were originally "filed under" Chapter 7, or whether it also applies to cases that were initially filed under another chapter and later converted to a case under Chapter 7, such as in the present case. *Compare Pollitzer v. Gebhart*, 860 F.3d 1334, 1338 (11th Cir. 2017) (applying § 707(b) to converted case); *Advanced Control Solutions, Inc., v. Justice*, 639 F.3d 838, 840 (8th Cir. 2011) ("[A]s we have previously indicated, § 707(b)(1) applies with equal force to bankruptcy proceedings that commenced under chapter 7 as with those converted from chapter 13."); *In re Chapman*, 447 B.R. 250, 253 (B.A.P. 8th Cir. 2011) (same); *In re Gold*, No. 09-13379-JNF, 2015 WL 1282300, at *4 (Bankr. D. Mass. Mar. 18, 2015); *In re Lassiter*, No. 08-31578-KRH, 2011 WL 2039363, at *5 (Bankr. E.D. Va. May 24, 2011) (same); *In re St. Jean*, 515 B.R. 864, 870 (Bankr. M.D. Fla. Jan. 24, 2011); *In re Perfetto*, 361 B.R. 27, 30-31 (Bankr. D.R.I. 2007) (same); *with In re Guarin*, No. 09–42294–JBR, 2009 WL 4500476, at *1 (Bankr. D. Mass. Dec. 3, 2009) (§ 707(b)(1) does not apply to converted cases), *McDow v. Dudley (In re Dudley)*, 405 B.R. 790, 801 (Bankr. W.D. Va. 2009) (same), *In re Miller*, 381 B.R. 736, 741 (Bankr. W.D. Ark. 2008) (same), *In re Ryder*, No. 07–40192–EDJ, 2008 WL 3845246, at *1–2 (Bankr. N.D. Cal. Aug.18, 2008) (same), *In re Fox*, 370 B.R. 639, 648 (Bankr. D.N.J. 2007) (same).

presumption of abuse arises after application of the means test or is rebutted under § 707(b)(2),

the court "shall consider (A) whether the debtor filed the petition in bad faith; or (B) the totality

of the circumstances . . . of the debtor's financial situation demonstrates abuse." *Id.* at §

707(b)(3).

In his Motion, the UST relies on § 707(b)(3)(B), the totality of the circumstances

provision, as the basis for dismissal under § 707(b)(1) as no presumption of abuse arose after

application of the means test.[10]  As the moving party, the UST has the burden of proof to

demonstrate abuse by a preponderance of the evidence.  *See, e.g., In re Gold*,  2015 WL

1282300, at *5 (holding that "[t]he party seeking dismissal for abuse bears the burden of proof

by a preponderance of the evidence"); *In re Oot*, 368 B.R. 662, 665 (Bankr. N.D. Ohio 2007)

(same).  "[B]ecause the elements of bad faith and totality of the circumstances are disjunctive, a

party can sustain its burden by proving either element by a preponderance of the evidence." *In

re Riley*, No. 09-10096-JNF, 2010 WL 3718017, at *5 (Bankr. D. Mass. Sept. 14, 2010).  The

UST does not allege that the Debtor filed her petition in bad faith and focuses instead on the

totality of the Debtor's financial circumstances.

Prior to BAPCPA, a court could dismiss a Chapter 7 case if it found that granting relief

would be a "substantial abuse," a term that was not defined in Bankruptcy Code.  There was also

a presumption in favor of granting the relief requested by the debtor.  In enacting the

amendments to § 707(b), Congress deleted "substantial" as qualifying the abuse determination

and removed the presumption in favor of the debtor, thereby relaxing the standard for dismissal.

---

I find the reasoning of the cases concluding that § 707(b)(1) is applicable in converted cases to be more
persuasive.  These cases conclude, among other things, that the reference to "filed" in § 707(b)(1)
identifies the type of debtor (an "individual" debtor) rather than as a limitation dependent on the case's
travel to Chapter 7.  This interpretation ensures determinations of abuse are not bypassed in converted
individual cases versus individual cases initially "filed under" Chapter 7.

[10] The parties do not dispute that the Debtor's debts are primarily consumer debts.

*See, e.g., In re Weixel*, 494 B.R. 895, 901 (B.A.P. 6th Cir. 2013); *In re Hartwick*, 359 B.R. 16, 20

(Bankr. D.N.H. 2007) (finding that "the only material changes under BAPCPA are an apparent

relaxation of the standard from substantial abuse to abuse and the addition of the means test.").

Courts have acknowledged, however, that "pre-BAPCPA precedent provides assistance in giving

meaning to the phrase totality of the circumstances" under § 707(b)(3). *In re Crink*, 402 B.R.

159, 169 (Bankr. M.D.N.C. 2009) (internal quotations omitted); *see also In re Weixel*, 494 B.R.

at 901 ("Although BAPCPA changed the standard of substantial abuse to abuse and eliminated

the presumption in favor of the debtor being granted relief, § 707(b)(3) otherwise essentially

codifies the principles of pre-BAPCPA case law concerning § 707(b)."); *In re Riley*,  2010 WL

3718017, at *6 ("[C]ourts generally refer to pre-BAPCPA cases and the factors identified in

them to determine whether a case warrants dismissal under the totality of the circumstances.").

In this Circuit, courts look to the pre-BAPCPA "totality of the circumstances" test set

forth in *Lamanna*, for guidance regarding the exercise of their equitable discretion in interpreting

§ 707(b) and considering the totality of a debtor's circumstances under § 707(b)(3).  *See, e.g., In*

*re Boule*, 415 B.R. 1, 5 (Bankr. D. Mass. 2009) (holding that the pre-BAPCPA concepts in

*Lamanna* for determining substantial abuse apply to ascertaining abuse based on a totality of

circumstances under § 707(b)(3)).  The non-exhaustive list of factors to be considered when

analyzing the totality of a debtor's circumstances includes whether a debtor: 1) "is merely

seeking an advantage over his creditors, or is 'honest,' in the sense that his relationship with his

creditors has been marked by essentially honorable and undeceptive dealings," 2) "is 'needy' in

the sense that his financial predicament warrants the discharge of his debts in exchange for

liquidation of his assets," and 3) has an "ability to repay his debts out of future earnings." *In re*

*Lamanna*, 153 F.3d at 5–6 (quoting *In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989)).

Other factors relevant to need include whether the debtor enjoys a stable source of
income, whether he is eligible for adjustment of his debts through Chapter 13 of

the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities.

*Id.*; *see also In re Maiorino*, 435 B.R. 806, 809 (Bankr. D. Mass. 2010) (examining the factors set forth in *Lamanna* and also considering whether a debtor "was forced into Chapter 7 by unforeseen or catastrophic events[,]" another factor highlighted by the Sixth Circuit in *Krohn*).

The fundamental purpose of § 707(b)(3) is to deny relief under Chapter 7 where, after examining the totality of a debtor's financial circumstances, the Court determines that the Debtor has an ability to pay something material to creditors, but is attempting to unfairly avoid paying those creditors. *See, e.g., In re Lamanna*, 153 F.3d at 5 (determining that a "debtor's ability to repay out of future disposable income [is] the primary, but not necessarily conclusive, factor of 'substantial abuse'" and finding abuse where the debtor had the ability to pay all his debts under a Chapter 13 plan); *DeAngelis v. Belanger* (*In re Belanger*), 524 B.R. 634, 641 (Bankr. E.D. Pa. 2015) (concluding "[a] Chapter 7 debtor's ability to pay a substantial portion of his debts is of paramount importance to a determination of abuse"; whether the debtors' schedules contain "misleading and erroneous information" is of import "not so much in the missteps themselves" but that they demonstrate a significant surplus net monthly income that should be available to provide a greater recovery to the creditor body); *In re Maiorino*, 435 B.R. at 809–10 (considering postpetition developments in addition to the situation as it existed on the Chapter 7 petition date in making § 707(b)(3) totality of circumstances assessment); *In re Honkomp*, 416 B.R. 647, 649 (Bankr. N.D. Iowa 2009) (quoting *In re Booker*, 399 B.R. 662, 667 (Bankr. W.D. Mo. 2009)) ("When considering the § 707(b)(3)(B) totality of the circumstances, 'the Court should consider primarily, if not exclusively, the [d]ebtors' ability to pay.'"); *In re Gotham*, 327 B.R. 65, 78 (Bankr. D. Mass. 2005) (applying *Lamanna* factors and concluding that their application "does not result in clear victory for either side[, but that w]hen viewed in their totality, however, the

facts support that the [d]ebtors do not have the income to pay their creditors and did not set out

to deceive them or the Court when they filed").  In determining whether debtors have the ability

to repay their debts, Courts frequently look to whether, under a hypothetical Chapter 13

repayment plan, the debtor has the ability to repay a meaningful percentage of his or her

unsecured debts.  *See In re Slone*, 441 B.R. 274, 278 (Bankr. N.D. Ohio 2010).  The UST's

evidence focuses primarily on whether the Debtor's conduct in relation to her creditors was

"honest" and whether she sought to gain an unfair advantage over certain creditors before and

during her Chapter 13 case.

In considering the totality of the circumstances under § 707(b)(3), the Court "may

consider postpetition developments in addition to the situation as it existed on the Chapter 7

petition date [. . . and] whether the Debtor is eligible to be a debtor under Chapter 13." *In re*

*Maiorino*, 435 B.R. at 809–10 (internal citations omitted).  Indeed, some courts view an

assessment of a debtor's postpetition financial situation, including circumstances as they existed

at the time of the hearing on a dismissal motion under § 707(b)(3), to be essential in evaluating

the totality of the Debtor's circumstances.  *See, e.g., In re Lamanna*, 153 F.3d at 4 (determining

"the 'totality of the circumstances' test demands a comprehensive review of the debtor's current

and potential financial situation"); *In re Wierzbicki*, 506 B.R. 935, 943 (Bankr. M.D. Fla. 2014)

(finding that because a totality of the circumstances analysis requires a court to determine a

debtor's ability to pay, postpetition events are properly considered under § 707(b)(3)(B)); *Riley*,

2010 WL 3718017, at *6 ("Courts considering dismissal under the 'totality of the circumstances'

generally consider both pre and postpetition acts and circumstances."); *In re Vogeler*, 393 B.R.

240, 243 (Bankr. D. Kan. 2008) (finding that "[§] 707(b) is not dependent on the petition date

and what happens prior to filing; rather, whether to dismiss a case for abuse may depend on

developments occurring after filing but before discharge is granted"); *In re Hartwick*, 359 B.R. at

15

22 (holding that under § 707(b)(3)'s totality-of-circumstances test the court must consider the

debtor's financial circumstances at the time the motion to dismiss was heard); *In re Pennington*,

348 B.R. 647, 651 (Bankr. D. Del. 2006) (concluding that "[t]here is no indication in the

language of [§ 707(b)(3)] or in [its] legislative history that Congress meant to limit temporally

the Court's consideration of the Debtor's financial condition when determining whether to

dismiss a case for abuse [and holding that the court] must consider the Debtor's financial

condition at the time of the hearing on the motion to dismiss in determining whether granting

chapter 7 relief is an abuse under section 707(b)(3)"); *but see In re Karlstrom*, 455 B.R. 370, 373

(Bankr. W.D.N.Y. 2011) (holding, in case filed originally under Chapter 7, that postpetition

events have no bearing on the outcome of a motion to dismiss under § 707(b)(3) "[b]ecause the

granting of relief will always relate back to the filing date [and] circumstances at that moment in

time will determine the abusiveness of the granting of relief for purposes"); *In re Huval*, No. 05-

51962, 2006 WL 2846882 at *2 (Bankr. W.D. La. June 21, 2006) (same).  "[N]othing in §

707(b)(3) suggests that Congress intended the Court to distinguish between debtors who have

always had disposable income available and debtors who have become able to pay their debts

either due to an increase in income or a decrease in expenses . . . ." *In re Goble*, 401 B.R. 261,

276-77 (Bankr. S.D. Ohio 2009) (internal quotation omitted).  Further, "[b]ecause the Debtor, as

a below median income debtor, was not required to complete the means test, her excess income

as reflected in Schedules I and J is the appropriate figure to be used in examining her ability to

pay as part of the totality of the circumstances test." *In re Boule*, 415 B.R. at 6; *see also In re

Crink*, 402 B.R. at 168 (holding that since debtors with below median incomes are exempted

from the means test by § 707(b)(7), "if the debtor's ability to pay is not considered under [§]

707(b)(3)(B), then there would be no mechanism under BAPCPA for a court to consider the

ability of a below median income debtor to pay her creditors in making a determination of abuse.").

Most courts considering evidence of postpetition conduct or developments when evaluating a motion to dismiss for abuse under § 707(b)(3) do so in the context of determining whether the totality of the circumstances demonstrate that a debtor has some ability to repay creditors that he or she is unfairly seeking to avoid. *See, e.g., In re Lamanna*, 153 F.3d at 5; *In re Maiorino*, 435 B.R. at 809–10. In this case, much of the evidence relates to the conduct of the Debtor during the pendency of her Chapter 13 case in filing estimates of her expenses that the UST contends were underestimated in order to remain in a Chapter 13 case while the debtor had the benefit of the automatic stay as she attempted to modify her mortgage obligations through a loan remediation. This case presents an atypical request to dismiss a converted Chapter 7 case for abuse, not because the evidence shows that the Debtor can pay more to her creditors, but rather primarily because the UST contends that she could actually pay less to creditors than she showed in her schedules and engaged in abuse of the process during her Chapter 13 case.

After carefully considering the totality of the Debtor's circumstances, although the determination is a close one given the inferences that could be drawn based on the Debtor's statements at trial, I find that granting the Debtor relief under Chapter 7 would not be an abuse of the provisions of that chapter. The Debtor certainly exhibited a lack of diligence in completion of her Schedule J based on a misguided motivation of doing "whatever was necessary" to ensure that the numbers on her Schedule J "worked" to serve her goal of saving her principal residence at various points in her case.[11] While the Debtor's contemplated "belt-tightening" never

---

[11] There is no question that "[p]reparing a Chapter 13 budget 'backward'—starting from the amount the debtor 'needs' to make the payments required by the plan—is an invitation to disaster." Keith M. Lundin, *Lundin On Chapter 13*, § 36.17, at ¶ 27, LundinOnChapter13.com (last visited on April 29, 2021). "If expenses are underestimated, the debtor will not have enough money to meet basic living requirements after making plan payments and the plan will fail." *Id*. at ¶ 26.

materialized and she failed to achieve her expense estimates, the Court declines to draw the inference that the Debtor intended to mislead the Court or creditors such that that the totality of the Debtor's circumstances would demonstrate abuse.

The Debtor did not consider family contributions in completing any of her schedules, but explained the omission based on her perception that she could not rely on the contributions. No financial records were introduced to establish the regularity of the prepetition contributions or impeach the Debtor's testimony at trial that she could not rely on those contributions being made after the Petition Date. Similarly, the Debtor's testimony that she filled out the forms the way she thought she needed to in order to show she could afford her mortgage, while reflecting the desperation of someone trying to save her home, might also support an inference that estimated expenses were not made in good faith and were an effort to manipulate the process to achieve an unfair advantage over creditors under different circumstances. As noted above, however, the UST did not introduce any bank statements or other records demonstrating the Debtor's actual expenses before and after she filed her Schedule J and supplements, other than in the post-conversion period. The Debtor testified that she reviewed her bills to ascertain her expenses in order to complete Schedule J and the supplements. The bank statements that were introduced for the period after September of 2017 through and after conversion of the Debtor's case to Chapter 7 do show that the Debtor's estimates were not accurate at the time of conversion, but those estimates do not have a sufficient nexus to the periods before and after the Debtor filed Schedule J and First Amended Schedule J to support a finding that the Debtor acted dishonestly. Moreover, that evidence does not support an inference that the Debtor could repay any material amount of her prepetition debts absent relief from her mortgage payments.

The Post-Conversion Schedules show significantly increased expenses that offset increased income. The UST appears to suggest that increased expenses reflected in Schedule J

were not reasonable.  However, the Court cannot conclude that the estimated expenses are

intentionally inflated and unreasonable.  *See, e.g., In re Gold*, 2015 WL 1282300, at *6 (in

determining the reasonableness of expenses for the purposes of § 707(b)(3), a court may

substitute its judgment for that of the debtor when, among other things, the debtor's proposed

expenditures as a whole appear to be deliberately inflated and unreasonable).  The Debtor's

good-faith estimates and cost-cutting efforts having failed, her Post-Conversion Schedules

appear to reflect the Debtor's financial circumstances at that point in her case and were

consistent with the schedule of expenses filed in her husband's case.

Because the Debtor's case was originally filed as a Chapter 13 case and has been

converted to a Chapter 7 case, this case presents timing issues that are unique to converted cases

in the context of § 707(b)(3).  As previously discussed, the Court is persuaded by the reasoning

that reads § 707(b)'s reference that it is applicable to "a case filed by an individual debtor under

this chapter," in conjunction with § 348(a), such that because a Debtor is deemed to have "filed

under" the converted-to chapter, as of the date the original petition was filed under § 348(a), §

707(b) applies in equal force in converted cases. *See In re Gold*, 2015 WL 1282300, at *4

(surveying cases).[12]  That this case was converted from a case under Chapter 13 does not mean

that the Court should overlook the fundamental purpose of § 707(b)(3) to deny relief to debtors

who have the ability to repay creditors, but who unfairly attempt to avoid doing so.  *See, e.g., In

re Lamanna*, 153 F.3d at 5.

Here, the allegations are that the Debtor really had no ability to repay creditors and

manipulated her schedules in an effort to remain in a Chapter 13 case to attempt to obtain a

---

[12] This view is further supported by Fed. R. Bankr. P. 1019(2) which provides an extension of time to file
a motion under § 707(b) in cases converted to Chapter 7; a deadline which necessarily suggests that §
707(b) applies to cases converted to Chapter 7 from another chapter.  *In re Croft*, 539 B.R. 122, 130
(Bankr. W.D. Tex. 2015).

modification of her home mortgage by delaying that creditor.  By extension, one might conclude

that the Debtor should have filed a Chapter 7 rather than a Chapter 13.  While I may take into

consideration evidence of postpetition conduct, that conduct does not demonstrate that this

Debtor had or has any ability to pay her debts that is greater than reflected on her schedules.

While there certainly is evidence that might have supported dismissal or conversion of the

Debtor's Chapter 13 case for cause under § 1307, that evidence does not demonstrate abuse

under § 707(b)(3) under the circumstances of this case.  Similarly, the allegations that the Debtor

intentionally misrepresented her expenses on Schedule J and in supplements thereto may be

more appropriately addressed through the UST's objection to the Debtor's discharge under §

727.

Accordingly, the Court shall deny the Motion.

## B.  Objections to Discharge under § 727(a)(4) and (5)

Obtaining a discharge at the conclusion of a bankruptcy case is the principal goal of all

eligible individual debtors and the "embodiment of the fresh-start policy of the Bankruptcy

Code." *Nickless v. Fontaine (In re Fontaine)*, 467 B.R. 267, 270 (Bankr. D. Mass. 2012).  It is

well-settled, therefore, that "the provisions of § 727 should be construed liberally in favor of

debtors[, and o]bjections to discharge should be narrowly construed in furtherance of the

Bankruptcy Code's fresh start policy[,] and the claimant must show that its claim comes squarely

within an objection enumerated in Bankruptcy Code § 727." *Warchol v. Barry (In re Barry)*, 451

B.R. 654, 659 (B.A.P. 1st Cir. 2011) (internal citations and quotations omitted). "The reasons for

denying a discharge to a bankruptcy must be real and substantial, not merely technical and

conjectural." *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987) (quotation omitted).

The UST, as the plaintiff, has the burden of proof by a preponderance of the evidence

with respect to the Discharge Objections, *see, e.g., In re Tully*, 818 F.2d at 110 (holding "[t]he

20

burden of proof rests with the trustee"); *Lassman v. Mahfouz (In re Mahfouz)*, 529 B.R. 431, 447

(Bankr. D. Mass. 2015) ("Exceptions to discharge under § 727 require proof by a preponderance

of the evidence"); *In re Fontaine*, 467 B.R. at 270 ("Rule 4005 of the Federal Rules of

Bankruptcy Procedure places the burden of proof in an action objecting to a debtor's discharge

on the objecting party [and t]his burden is not easily satisfied").

The UST asserts that the Debtor has made false oaths by failing to accurately disclose or

account for income and expenses in her sworn statements and schedules, such that a discharge

under Chapter 7 should be denied pursuant to § 727(a)(4). Compl. ¶ 28. Additionally, the UST

points to the Debtor's "failure to satisfactorily explain her financial circumstances, her expenses

and income, and the deficiency of assets to meet her liabilities" as warranting denial of her

discharge under § 727(a)(5). *Id*. at ¶ 31. The Debtor testified that any omissions to her

schedules were not made with fraudulent intent or reckless indifference to the truth and has

argued that "belt-tightening and adjustments to a budget during the course of a bankruptcy case

in order to provide a higher payment to creditors" do not rise to a level of fraud, but just

demonstrate "the Defendant simply wants to do whatever it takes to keep her home." Joint

Pretrial Memo. 11–12.

### 1. False Oaths under § 727(a)(4)

Section 727(a)(4)(A) provides that "[t]he court shall grant the debtor a discharge, unless

the debtor knowingly and fraudulently, in or in connection with the case made a false oath or

account." 11 U.S.C. § 727(a)(4)(A). To deny a discharge under § 727(a)(4)(A), the UST must

demonstrate by a preponderance of the evidence that the Debtor "knowingly and fraudulently

made a false oath," which relates to "a material fact." *In re Tully*, 818 F.2d at 110. "'[O]nce it

reasonably appears that the oath is false, the burden falls upon the [debtor] to come forward with

evidence that he has not committed the offense charged'" in order to avoid an inference that the

statement was knowingly and fraudulently made. *Id.* at 110 (quoting *In re Mascolo*, 505 F.2d 274, 276 (1st Cir. 1974)).

Fraudulent intent under § 727(a)(4) must be shown by actual fraud, although reckless indifference to the truth "has consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A)." *In re Tully*, 818 F.2d at 112. "[B]ecause a debtor rarely gives direct evidence of fraudulent intent, intent to defraud a creditor may be established by circumstantial evidence or inferred from a course of conduct." *Robin Singh Educ. Servs. v. McCarthy (In re McCarthy)*, 488 B.R. 814, 826 (B.A.P. 1st Cir. 2013); *see also Desmond v. Varrasso (In re Varrasso)*, 37 F.3d 760, 764 (1st Cir. 1994) (holding that "in certain cases, circumstantial evidence may be sufficiently potent to establish fraudulent intent beyond hope of contradiction"). However, a "debtor's honest confusion or lack of understanding may weigh against an inference of fraudulent intent[.]" *In re McCarthy*, 488 B.R. at 827. Additionally, "an explanation by a [debtor] that he had acted upon advice of counsel who in turn was fully aware of all the relevant facts generally rebuts an inference of fraud [unless] it is transparently plain that the property should be scheduled." *Zizza v. Harrington (In re Zizza)*, 875 F.3d 728, 732 (1st Cir. 2017) (internal citations and quotations omitted).

In the discharge and dischargeability context, "a determination concerning fraudulent intent depends largely upon an assessment of the credibility and demeanor of the debtor." *Palmacci v. Umpierrez*, 121 F.3d 781, 785 (1st Cir. 1997) (citation and quotation omitted). "A debtor's discharge should not be denied under § 727(a)(4)(A) if the false statement or omission is the result of mistake or inadvertence . . . or if the mistake is technical and not real." *JP Morgan Chase Bank, N.A. v. Koss (In re Koss)*, 403 B.R. 191, 211 (Bankr. D. Mass. 2009) (citations and quotations omitted).

"Misstatements in a debtor's Schedules[, Statement of Financial Affairs,] and/or in the debtor's sworn testimony at the § 341 meeting also qualify as false oaths within the purview of § 727(a)(4)(A)." *In re Fontaine*, 467 B.R. at 271 (citation and quotation omitted). "Omissions as well as affirmative misstatements qualify as false statements for [§] 727(a)(4)(A) purposes." *Republic Credit Corp. I v. Boyer (In re Boyer)*, 367 B.R. 34, 35 (Bankr. D. Conn. 2007). A material false oath under § 727(a)(4) is one that has "a non-trivial effect upon the estate and the creditors," *In re Fontaine*, 467 B.R. at 272, because its "subject matter 'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property,'" *In re Tully*, 818 F.2d at 111 (quoting *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984)).

This case presents the challenge of determining whether Schedule J "estimates" were sufficiently erroneous to be "false" and whether the Debtor made those estimates, or omitted expenses initially, with an intent to deceive or with reckless indifference to the truth. The Debtor testified that the expenses estimated on each Schedule J that she filed were based on household bills that she reviewed, but that she had forgotten certain items, such as $500 allocated to tobacco and cigarettes, and estimated expected reductions incorrectly. The Court, although skeptical of some of the Debtor's explanations, cannot conclude that what has been proven represents deceit on the Debtor's part. The Court's experience is that debtors are sometimes aspirational in estimating their expenses because they intend to implement expense reductions in order to propose a feasible Chapter 13 plan. The Debtor's own testimony that she would do whatever it took to stay in her home, including filing estimates on Schedule J "filled out the way [she] needed to" to show she could support her mortgage, could be material and might support an inference of a reckless indifference to the truth that would constitute a basis for denial of the Debtor's discharge under § 727(a)(4). Where the UST did not introduce bank records showing

the actual expenses paid by the Debtor and her non-debtor spouse for the period before and after

the Debtor filed her original Schedule J and her First Amended Schedule J, the Court is

unwilling to make the inference that the "estimates" were so unrealistic so as to demonstrate an

intent to deceive or with reckless indifference to the truth.  Unquestionably, the Debtor increased

her expense "estimates" at the time of conversion to amounts that were significantly greater than

her previous schedules (but which appear to be consistent with the Schedule J filed by her

husband in his Chapter 13 case at the time of conversion).  The UST has not met his burden to

demonstrate that any of the Schedule J post-conversion estimates were "false" or that any

statements were made with the requisite intent such that the Debtor should not be entitled to a

discharge.

The Court also finds that the UST did not meet his burden to demonstrate that the Debtor

had an intent to deceive or acted with reckless indifference to the truth by not disclosing the 2015

tax refund received prior to the filing date, even assuming that the Debtor was required to

disclose the 2015 tax refund as "other income" in response to Question 5 of the Statement of

Affairs - which is not clear.[13]  That the Debtor appears to have properly scheduled "gross

income" for each year in the response to Question 5 of the Statement of Affairs and attempted to

estimate an "over-withholding" amount as "other income" in response to Schedule I line 8(h) as

an "anticipated tax refund" is consistent with her testimony and supports the inference that the

Debtor did not intend to deceive or act with reckless indifference to the truth.  The Debtor

testified that she was not aware of any question that required disclosure of the refund received

prior to the Petition Date.  While the omission of certain income the Debtor's supplemental

---

[13] The Debtor asserts that no question in the Schedules or Statement of Affairs expressly requires
disclosure of prepetition tax refunds received by the Debtor.  The UST contends that the refund should
have been disclosed in response to Question 5 in the Statement of Financial Affairs as other income
consisting of a non-taxable tax refund.

schedule from activities the Debtor categorized as "hobbies," however small, constitutes a false

oath, I do not find that the Debtor had the requisite intent with respect to the omission to require

denial of the Debtor's discharge under § 727(a)(4).

The Debtor's failure to schedule any financial contributions from her father-in-law on her

original Schedule I presents a close call as well.  Based on the Debtor's testimony at trial and her

deposition testimony, the Debtor and her husband had received some contributions towards the

"heating bills" from the Debtor's father-in-law prior to the Petition Date. The Debtor testified

that those payments were inconsistent and she did not think of those payments as "income" that

should be included in her estimate of monthly income on Schedule I.  She testified that her

father-in-law was unreliable and would contribute when he had extra money, which was

infrequent.  The Court finds that the Debtor exhibited a lack of diligence, but does not infer

recklessness or the requisite intent to make false statements from her conduct.  No other evidence

was introduced showing actual contributions made by the Debtor's father-in-law to demonstrate

the amounts or regularity of any such contributions.  Notably, the Debtor did not reflect any

anticipated family contributions on her Post-Conversion Schedule I.  The Debtor was not

examined regarding her expectations at the time of conversion of her case or amounts that she

received in the months preceding her conversion.  The Court finds that the UST did not meet his

burden with respect to the § 727(a)(4) count.

## 2.  Loss or Deficiency of Assets under § 727(a)(5)

Section 727(a)(5) provides that the court shall grant the debtor a discharge, unless "the

debtor has failed to explain satisfactorily ... any loss of assets or deficiency of assets to meet the

debtor's liabilities[.]"  11 U.S.C. § 727(a)(5).  "The plaintiff has the initial burden of producing

some evidence that the debtor no longer has assets which he previously owned [and o]nce the

plaintiff has established the loss of an asset, it is up to the debtor to provide a satisfactory

explanation for the loss or deficiency of the asset." *Aoki v. Atto Corp. (In re Aoki)*, 323 B.R. 803 (B.A.P. 1st Cir. 2005). "What constitutes a satisfactory explanation for § 727(a)(5) purposes is left to the discretion of the court." *In re Mahfouz*, 529 B.R. at 446 (internal citations and quotations omitted).

The UST did not make specific arguments as to how the Debtor failed to explain any loss of assets or deficiency of assets to meet the Debtor's liabilities and did not meet his burden to introduce evidence satisfying the elements of the § 727(a)(5) count. If the focus of this count was the 2015 tax refund, in her testimony, the Debtor accounted for how much of the amount of that refund that was spent and the record reflects other expenses in the month before filing related to payments to her bankruptcy counsel. No bank records were introduced showing an amount of money for which the Debtor could not account.

## IV.    CONCLUSION

For the reasons stated above, the Court (i) denies, pursuant to § 707(b)(1) and (3)(B), the UST's Motion and (ii) overrules the Discharge Objections. A separate order shall enter on the Motion and judgment shall enter in favor of the Debtor and against the UST regarding the Complaint.

By the Court,

Dated: April 30, 2021

_____
Christopher J. Panos
United States Bankruptcy Judge